# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| JAMES E. MURPHY, On behalf of himself and all others similarly situated | **Civil Action No. 07-282-CV-W-FJG** |
| Plaintiff | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| NOVASTAR FINANCIAL, INC., W. LANCE ANDERSON, SCOTT F. HARTMAN and GREG METZ | |
| Defendants | |

Plaintiff, James E. Murphy, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged on the basis of personal knowledge. The allegations made on the basis of Plaintiff's information and belief are based upon, inter alia, counsel's investigation, which includes without limitation: (a) review and analysis of the regulatory filing made by NovaStar Financial, Inc. ("NovaStar" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of securities analysts' reports; (c) review and analysis of press releases and media reports issued by and disseminated on behalf of NovaStar; and (d) review of other publicly available information concerning NovaStar.

## SUMMARY AND OVERVIEW

1.      This is a securities fraud class action on behalf of all investors in securities of NovaStar between May 4, 2006 and February 20, 2007, inclusive (the "Class Period"), against NovaStar and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act"). Members of the Class (as defined *infra)* include purchasers of NovaStar common stock and call options during the Class Period and sellers of NovaStar put options during the Class Period (collectively referred to herein as "NovaStar Securities").

2.      NovaStar is a real estate investment trust ("REIT") that originates, invests in and services residential nonconforming (or "sub-prime") loans.

3.      Throughout the Class Period, among other things: (i) NovaStar's reported financial results were falsely inflated; (ii) NovaStar misrepresented the quality of its mortgage loan portfolio and its ability to pay dividends; (iii) NovaStar failed to disclose that its reported financial results projections were based upon faulty assumptions because of inadequate internal controls; and (iv) NovaStar failed to disclose that the Company lacked a reasonable basis to make projections regarding its ability to maintain its status as a REIT.

4.      As a result of the Defendants' false statements, NovaStar Securities traded at artificially inflated or distorted levels during the Class Period -- the common stock trading as high as $37.85 on May 4, 2006.

5.      On February 20, 2007, NovaStar shocked the market by announcing that the underwriting guidelines it had used in 2006 were "inappropriate" and that, as a result, the Company had suffered a loss of more than $14 million for the fourth quarter of 2006.

Case 4:07-cv-00282-ODS   Document 1   Filed 04/10/07   Page 2 of 29

NovaStar further announced that it did not expect to make any REIT taxable income for the next four years and, therefore, would not be required to pay a dividend to shareholders. Moreover, NovaStar announced that due to recent events, the Company's management is evaluating whether or not the Company should retain its REIT status.

6. In response to this announcement, the market responded swiftly, with NovaStar's stock price dropping more than 30% on extremely high volume.

## JURISDICTION AND VENUE

7. Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§ 10(b) and 20(a) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

8. Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

9. The Company's principal executive offices are in Kansas City, Missouri, where the day-to-day operations of the Company are directed and managed.

10. In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

11. Plaintiff, James E. Murphy, transacted in NovaStar Securities as described in the attached certification and was damaged thereby.

12. Defendant NovaStar is a specialty finance company that originates, invests in and services residential nonconforming loans. Defendant NovaStar is

3

headquartered in Kansas City, Missouri.

13.    Defendant W. Lance Anderson ("Anderson") was the President, Chief Operating Officer ("COO") and a director of NovaStar during the Class Period.

14.    Defendant Scott F. Hartman (" Hartman") was the Chief Executive Officer ("CEO") of NovaStar during the Class Period.

15.    Defendant Greg Metz ("Metz") was the Chief Financial Officer ("CFO") of NovaStar during the Class Period.

16.    Defendants Anderson, Hartman and Metz are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of NovaStar's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Each Individual Defendant had knowledge of and was motivated to

4

conceal NovaStar's problems. As chief financial officer, Metz was responsible for financial reporting to and communications with the market. Defendants Hartman, and Anderson, as CEO and COO respectively, were responsible for the financial results and press releases issued by the Company. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

18. Each defendant is liable for making the false statements described herein, and/or for failing to disclose adverse facts known to him about NovaStar. Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of NovaStar common stock. Defendants' wrongful conduct: (i) deceived the investing public regarding NovaStar's business prospects; (ii) artificially inflated or distorted the price of NovaStar Securities; and (iii) caused Plaintiff and other members of the Class to transact in NovaStar Securities at artificially inflated or distorted prices.

## BACKGROUND

19. NovaStar is a specialty finance company that originates, invests in and services residential nonconforming (or sub-prime) loans. On its website, NovaStar states that:

> NovaStar Financial, Inc. is one of the nation's leading lenders and investors in nonconforming residential mortgage loans. Founded in 1996, NovaStar efficiently brings together the capital markets and American families financing their homes.
>
> We focus on single-family, nonconforming mortgage loans, involving borrowers whose loan size, credit details or other circumstances fall outside conventional agency mortgage loan guidelines. In a well-managed portfolio, these loans offer higher net interest margins than conventional agency loans.

5

NovaStar originates mortgage loans nationwide through independent brokers, correspondent relationships and direct to the consumer via retail operations. We also provide servicing for loans we retain in our portfolio.

As a Real Estate Investment Trust (REIT), NovaStar generates most of its earnings through mortgage securities held in portfolio. We put in place long-term funding for our mortgage lending by pooling loans as collateral for bonds and selling a portion of these securities to investors. In the process, NovaStar retains a high-return portfolio of securities backed by specified cash flows from these loans.

We manage risk through carefully developed underwriting standards, mortgage insurance, pooling and sale of loans, and interest rate hedging strategies.

See http://www.NovaStarmortgage.com/corporate/about/ businessprofile.aspx (last visited Feb. 23, 2007).

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

20.    On February 27, 2006, NovaStar issued the following press release:

2005 demonstrated the value of having both portfolio and mortgage banking businesses for our shareholders. Strong portfolio earnings more than compensated for weakness in our mortgage banking business, primarily because of better than expected credit performance driven by rising home prices," said Scott Hartman, Chief Executive Officer. "Our priorities for 2006 continue to focus on cost disciplines in our mortgage banking operations and managing a portfolio to deliver attractive risk-adjusted returns."

For full-year 2005, NovaStar reported $132.5 million in net income available to common stockholders, up 21 percent from 2004. Earnings per share available to common stockholders was $4.42, a 4 percent increase on a larger number of shares outstanding compared with $4.24 in 2004. Portfolio net interest income for 2005 was $219.9 million, an increase of 49 percent.
Fourth-quarter net income available to common stockholders was $26.4 million, up 16 percent from the fourth quarter of 2004. Earnings per share available to common stockholders were $0.84 in the fourth quarter, verses $0.85 a year earlier, on 17 percent more

6

diluted shares outstanding. Portfolio net interest income was $57.5 million, an increase of 45 percent.

Greg Metz, Senior Vice President and Chief Financial Officer, noted: "2005 was clearly a challenging year with significant margin compression driven by a highly competitive mortgage banking environment. We proactively focused on cost controls and business efficiencies to mitigate the impact of tighter spreads. These efforts resulted in a 35 basis point reduction in the cost of wholesale production. We will continue to focus on cost containment and production efficiencies in 2006."

Dividend Guidance

NovaStar's management believes dividends declared for common stockholders during calendar 2006 will total at least $5.60 per share. consistent with regular quarterly dividends of $1.40 per share the company has declared since October 2004. The amount and timing of future dividends are determined by the Board of Directors based on REIT tax requirements, the company's financial condition and business trends at the time, so this dividend guidance is subject to change as necessary.

Estimated 2005 taxable income available to stockholders was $285 million, and approximately $76 million in dividends declared to date were applicable to 2005 taxable income (see table).

Portfolio Management

Loans under management were $14.0 billion at December 31, 2005, up 15 percent from a year earlier but reflecting a slight decline verses the third quarter. NovaStar securitized $1.7 billion in non-conforming loans in the fourth quarter and sold $421 million in loans to other financial institutions. Fourth-quarter annualized average return on assets in the portfolio was 1.65 percent, compared to 1.35 percent in the fourth quarter of 2004.

"We continue to build NovaStar's portfolio for the long term, and loans under management grew during 2005. In the fourth quarter, however, seasonally lower mortgage originations, brisk repayment activity and significant whole loan sales caused a slight drop in the overall size of the portfolio. Our priority remains to invest profitably in these assets and manage the risks for NovaStar shareholders," said Mike Bamburg, Senior Vice President and Chief Investment Officer.

7

Fourth-quarter earnings in accordance with generally accepted accounting principles in the United States of America (GAAP) included mark to market pretax gains of $3.2 million relating to derivative instruments and impairments of $7.6 million in the valuation of securities. Accounting rules for portfolio-related transactions can introduce volatility in quarterly GAAP earnings as a result of market movements in interest rates, but NovaStar employs hedging to mitigate risk and manage the portfolio in the interest of long-term shareholder value.

21.     On May 4, 2006, NovaStar issued a press release, announcing the Company's financial results for the first quarter of 2006. The press release stated, in pertinent part:

Some encouraging signs are appearing in the non-prime market: better coupons, more attractive whole-loan prices, and lower relative interest costs on the bonds we issue. The portfolio results continue to benefit from better-than-expected credit performance and our risk management strategies continue to perform well in a difficult interest rate environment," said Scott Hartman, Chief Executive Officer.

First-quarter net income available to common stockholders was $22.4 million, down 33 percent from $33.5 million a year earlier. Diluted earnings per share available to common stockholders were $0.69 on 16 percent more diluted shares outstanding. Portfolio net interest income was $49.3 million, an increase of 14 percent from $43.4 million a year earlier.

Dividend Guidance

Management reaffirmed their expectation that common dividends declared during calendar 2006 will total at least $5.60 per share. The amount and timing of future dividends are determined by the Board of Directors based on REIT tax requirements, the company's financial condition and business trends at the time, so this dividend guidance is subject to change as necessary.

Portfolio Management

Loans under management were $15.0 billion at March 31, 2006, up

8

17 percent from a year earlier. First-quarter annualized average return on assets in the portfolio was 1.40 percent, compared to 1.36 percent in the first quarter of 2005. NovaStar did not execute a major securitization or sale of whole loans in the first quarter. On April 28, 2006, NovaStar securitized $1.4 billion in nonconforming loans, which was accounted for as a financing for both GAAP and tax purposes.

First-quarter earnings in accordance with GAAP included mark to market pretax gains of $5.8 million relating to derivative instruments and impairments of $2.0 million in the valuation of securities. Accounting rules for portfolio-related transactions can introduce volatility in quarterly GAAP earnings as a result of market movements in interest rates, but NovaStar employs hedging to mitigate risk and manage the portfolio in the interest of long-term shareholder value.

Mortgage Banking

Excluding approximately $991 million in MTA bulk purchases, NovaStar originated $1.8 billion in nonconforming loans in the first quarter, down 6 percent from a year earlier. Wholesale production accounted for 76 percent of first-quarter originations. Average cost of wholesale production was 2.28 percent in the quarter, down from 2.73 percent a year earlier.

"Our market remains extremely competitive, but NovaStar benefited from lower costs in the first quarter and also experienced modest improvement in coupons. We remain cautiously optimistic regarding non-prime origination activity in 2006," said Lance Anderson, Chief Operating Officer.

Excluding payment option ARM products, which typically carry a one-month teaser rate of less than 2%, weighted-average coupon was 8.73 percent in the first quarter, up from 7.63 percent a year earlier. Credit quality of originations was similar to the prior-year quarter, with a weighted-average FICO score of 628 and average loan-to-value ratio of 81.3 percent.

Liquidity and Borrowing Capacity

NovaStar maintained strong liquidity and raised additional capital to fund the growth of its portfolio. As of March 31, 2006, NovaStar had borrowing capacity of $4.3 billion from major lenders. Cash and available liquidity totaled $172 million. In the

9

first quarter, the company issued 426,181 common shares through its dividend reinvestment and direct purchase program, for net proceeds of $11.4 million. Subsequent to the closing of the first quarter, NovaStar raised an additional $35 million of capital through the issuance of trust preferred securities.

22. The Company filed its Form 10-Q for the first quarter of 2006 on May 5, 2006, which repeated the Company's previously reported financial results. The Form 10-Q was filed with a certification by Hartman, which stated:

I, Scott F. Hartman, certify that:

1. I have reviewed this quarterly report on Form 10-Q of NovaStar Financial, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary, to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting,

10

or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

23. On August 3, 2006, NovaStar issued the following press release, announcing the Company's financial results for the second quarter of 2006:

Second-quarter performance highlights:

• Diluted earnings per share available to common shareholders were $0.99, vs. $1.29 a year earlier, on 14 percent more diluted shares outstanding in the current quarter.

11

- Portfolio of loans under management was $15.9 billion, up 17 percent from a year earlier.

- Portfolio net interest income was $54.9 million, a return on assets of 1.41 percent.

- Annualized return on average common equity was 27.5 percent, vs. 34.0 percent a year ago.

- NovaStar originated a record $2.8 billion in nonconforming loans, up 19 percent vs. a year earlier.

- Cost of wholesale production declined 68 basis points, year over year, to 1.78 percent.

NovaStar continues to demonstrate strength in a challenging time for the mortgage industry. We delivered our highest quarterly loan production ever, and earnings benefited from reduced costs of production and higher coupons. Credit performance in the portfolio remains strong, and our proactive risk management strategies have protected the portfolio during a period of tightening interest rate policy," said Scott Hartman, Chief Executive Officer.

Second-quarter net income available to common stockholders was $33.1 million, down 13 percent from $37.9 million a year earlier. Diluted earnings per share available to common stockholders were $0.99 on 14 percent more diluted shares outstanding. Portfolio net interest income was $54.9 million, down 1 percent when compared to the second quarter of 2005.

Greg Metz, Senior Vice President and Chief Financial Officer, commented: "We saw positive trends in our mortgage banking business during the second quarter, with strengthening whole loan prices impacting the gain-on-sale from our 2006-2 and 2006-3 securitizations. In addition, we continued to see our cost of production decline, driven by a combination of expense controls and higher production. However, this improvement was offset somewhat by rising interest rates and the provision for credit losses associated with our 2006-1 and 2006-MTA1 on-balance sheet securitizations."

Dividend Guidance

Management reaffirmed its expectation that common dividends

12

declared during calendar year 2006 will total at least $5.60 per share. As outlined in the table below, the REIT has approximately $104 million of taxable income from 2005 that remains to be distributed. NovaStar anticipates declaring both the third and fourth quarter dividends for 2006 prior to September 15, 2006, and paying these dividends in November and December. This should allow NovaStar to fully satisfy the distribution requirements for its 2005 taxable income. The payment of the dividend in December would represent an acceleration of the fourth quarter payment. Historically this dividend has been declared in December and paid in January. It should be noted that this will have no impact on the timing of taxability of the dividend for shareholders since the normal January dividend would also be taxable in 2006. Ultimately, however, the amount and timing of future dividends are determined by the Board of Directors based on REIT tax requirements, the company's financial condition and business trends at the time, so this dividend guidance is subject to change as necessary.

Portfolio Management

Loans under management grew 17 percent year-over-year to $15.9 billion at June 30, 2006. Second-quarter annualized average return on assets in the portfolio was 1.41 percent, compared to 1.67 percent in the second quarter of 2005.

NovaStar completed four securitizations in the second quarter. Two of these transactions, totaling $2.1 billion, were treated as a sale for accounting purposes, generating gain-on-sale income during the quarter. The other two securitizations, totaling $2.6 billion, were treated as financings for accounting purposes.

Second-quarter earnings in accordance with GAAP included mark to market pretax gains of $5.6 million relating to derivative instruments and mortgage securities held in trading accounts. Also, impairments of $4.5 million were realized in the valuation of mortgage securities available-for-sale. Accounting rules for portfolio-related transactions can introduce volatility in quarterly GAAP earnings as a result of market movements, but NovaStar employs hedging to mitigate risk and manage the portfolio in the interest of long-term shareholder value.

Mortgage Banking

13

NovaStar originated $2.8 billion in nonconforming loans in the second quarter, up 19 percent from a year earlier. Wholesale production accounted for about 84 percent of the originations. Average cost of wholesale production was 1.78 percent in the quarter, down from 2.46 percent a year earlier.

"We have a simple business philosophy: make good loans, minimize production costs, and target business with acceptable coupons. While continuing with the same sound practices, in a challenging business environment, we achieved production growth of 15 percent in the first half of 2006," said Lance Anderson, President and Chief Operating Officer.

Excluding payment option ARM products, weighted-average coupon was 8.97 percent in the second quarter, up from 7.62 percent a year earlier. Credit quality of originations was similar to the prior-year quarter, with a weighted-average FICO score of 625 and average loan-to-value ratio of 82.4 percent.

Liquidity and Borrowing Capacity

NovaStar maintained strong liquidity and raised additional capital to fund the growth of its portfolio. As of June 30, 2006, NovaStar had borrowing capacity of $3.9 billion from major lenders. Cash and available liquidity totaled $190 million.

24.     The Company filed its Form 10-Q for the first quarter of 2006 on August 9, 2006, which repeated the Company's previously reported financial results. The Form 10-Q was filed with a certification by Hartman, which stated:

I, Scott F. Hartman, certify that:

1.      I have reviewed this quarterly report on Form 10-Q of NovaStar Financial, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present

14

in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the ' effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

15

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

25. The Company filed its Form 10-Q for the first quarter of 2006 on November 7, 2006, which repeated the Company's previously reported financial results. The Form 10-Q was filed with a certification by Hartman, which stated:

I, Scott F. Hartman, certify that:

1. I have reviewed this quarterly report on Form 10-Q of NovaStar Financial, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly

16

during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

26. On November 7, 2006, NovaStar issued the following press release, announcing the Company's financial results for the third quarter of 2006: Third Quarter Results and Highlights:

17

- NovaStar declared common dividends of $1.40 per share payable on November 30, 2006 and December 29, 2006

- Non-prime originations were a record $2.9 billion, up 6% vs. a year earlier

- Cost of wholesale production declined by 39 basis points, year over year, to 1.79%

- Portfolio of loans under management was $16.4 billion, up 16% from a year earlier and 3% from the second quarter

- Portfolio net interest income was $45.9 million, representing a return on assets of 1.12%

Scott Hartman, NovaStar's Chief Executive Officer commented:

"During the third quarter we took several steps to prepare for a more adverse credit market. First, we increased reserves for our on-balance sheet transactions. Second, we increased reserves for loan repurchases from our whole loan sales. Third, we increased loss assumptions in our mortgage securities portfolio, resulting in some impairments and a reduction in unrealized gains."

Portfolio Management

Loans under management grew 16% year-over-year to $16.4 billion at September 30, 2006. Third-quarter annualized average return on assets in the portfolio was 1.12%, compared to 1.81% in the third quarter of 2005.

Pre-tax impairments of $6.8 million were taken on portfolio assets due to both increased loss assumptions and a decrease in interest rates, as derivative contracts used to hedge interest rate volatility lost value due to lower swap rates. In addition, loss reserves for the company's on-balance sheet portfolio were increased by $7.8 million during the third quarter.

Mortgage Banking

NovaStar originated $2.9 billion in non-prime loans in the second quarter, up 6% from a year earlier. Wholesale production accounted for about 91% of the originations. Average cost of wholesale production was 1.79% in the quarter, down from 2.18% a year earlier.

18

Excluding payment option ARM products, weighted-average coupon was 9.23% in the third quarter, up from 7.50% a year earlier. Credit quality of originations was similar to the prior-year quarter, with a weighted-average FICO score of 623 and average loan-to-value ratio of 83%.

In the third quarter, NovaStar completed two securitizations, NMFT 2006-4 and NMFT 2006-5 and closed the final pre-funding for both NMFT 2006-MTA1 and NMFT 2006-3. NMFT 2006-3, NMFT 2006-4 and NMFT 2006-5 were treated as a sale for accounting purposes, generating gain-on-sale income in the third quarter of $26.1 million, on total loan sales of $2.2 billion. The final pre-funding for NMFT 2006-5 of approximately $560 million, closed on October 20, 2006.

The company also sold $694 million of loans into the secondary market for a $4.9 million gain, net of reserves.

Liquidity and Borrowing Capacity

NovaStar maintained strong liquidity and raised additional capital to fund the growth of its portfolio. As of September 30, 2006, NovaStar had borrowing capacity of $4.3 billion from major lenders. Cash and available liquidity totaled $246 million.

27.     The statements set forth in ¶¶ 20-26 above were materially false and misleading when made because, among other things: (i) the Company's reported financial results were materially inflated in violation GAAP and SEC reporting rules; (ii) they fail to disclose that NovaStar lacked appropriate internal controls and, therefore, the Company's reported financial results and projections were based upon faulty assumptions regarding loan losses; and (iii) they fail to disclose that the Company lacked a reasonable basis to make projections regarding its ability to maintain its status as a REIT.

**DEFENDANTS' SCHEME BEGINS TO UNRAVEL**

28.     On February 20, 2007, NovaStar shocked the market by issuing the following press release:

> The credit performance of our portfolio, and specifically our 2006 originations, deteriorated during the fourth quarter, resulting in impairments on mortgage securities and additional loss provisions for loans held-in-portfolio in the REIT. Also, our gains upon securitization were reduced during the quarter because of lower whole loan prices. Furthermore, during the fourth quarter, we experienced a greater level of loan repurchase requests due to early payment defaults than we have historically. However, we believe our current reserves are adequate to cover the repurchase risk for all loans sold to date," said Scott Hartman, Chief Executive Officer.
>
> Additional 2006 and Fourth-Quarter Highlights
>
> •      Portfolio of loans under management was $16.3 billion at year-end. Portfolio return on assets was 1.21 percent for 2006 (0.94 percent in the fourth quarter).
>
> •      Nonconforming loan originations were $11.2 billion in 2006, up 21 percent from 2005. Fourth-quarter originations were $2.6 billion, up 20 percent from the same quarter in 2005.
>
> •      Cost of production for 2006 was reduced by 34 basis points, to 2.03 percent, compared to 2005. Fourth-quarter cost of production was 1.87 percent.
>
> •      NovaStar expanded its retail division with an asset purchase resulting in 19 new branches, adding a market channel for low-cost originations that it expects will serve as a platform for future growth.
>
> Portfolio Management
>
> Loans under management were $16.3 billion at December 31, 2006, up 17 percent from a year earlier but down from the third quarter, due in part to fourth-quarter whole loan sales. NovaStar securitized $1.8 billion in nonconforming loans in the fourth

20

quarter ($8.6 billion for the year). Return on assets in the portfolio was 0.94 percent in the fourth quarter (1.21 percent for the year).

On February 8, 2007, NovaStar closed a $375 million collateralized debt obligation (CDO). The assets collateralizing the obligation include securities created through past NovaStar securitizations, as well as mortgage backed securities purchased in the secondary market. The company retained the class D notes and subordinated notes, together representing $43.5 million in principal value.

"This CDO accomplishes two things for NovaStar. First, we were able to reduce funding costs on lower-tranche bonds from recent securitizations and second, we tapped an additional opportunity to benefit from our portfolio management capabilities. We believe that investing in higher rated mortgage securities will continue to provide good, risk-adjusted returns for the portfolio. During 2007, we may commit additional equity to purchase or retain mortgage securities. These securities are rated higher in the capital structure than our traditional residual investments and we intend to finance these securities with CDO debt," said Mike Bamburg, Senior Vice President and Chief Investment Officer.

Mortgage Banking

Fourth-quarter loan production was $2.6 billion, up 20 percent from a year earlier (full-year originations were $11.2 billion, up 21 percent over 2005). Wholesale production represented 85 percent of fourth-quarter originations, retail 9 percent (with new branches included only in December), and correspondent/bulk 6 percent. Average cost of production was 1.87 percent in the quarter, down from 2.15 percent a year earlier and was 2.03 percent for 2006, down from 2.37 percent in 2005.

"NovaStar originated 21 percent more loans in 2006 and made progress on reducing costs. The non-prime market remains very competitive, but we see potential for a more rational business environment as several competitors have withdrawn or put themselves up for sale," said Lance Anderson, President and Chief Operating Officer.

Anderson added, "The key area of focus for our mortgage

Case 4:07-cv-00282-ODS   Document 1   Filed 04/10/07   Page 21 of 29

banking operation is to ensure that the 2007 originations perform better than 2006 and in line with our expectations. In this regard, we have taken several steps which include:

(1)     Tightening of our underwriting guidelines;

(2)     Limiting the number of exceptions to our underwriting guidelines policy;

(3)     Enhancing our appraisal review process;

(4)     Implementing the use of NovaStar's Risk Assessment Score (NRAS) to identify loans with unacceptable levels of risk."

29.     In the February 20th press release and in a follow-up earnings conference call that same day, NovaStar made the shocking revelation that: (i) underwriting standards in 2006 were "inadequate"; (ii) the portfolio contained a far greater level of risk than previously revealed; (iii) it has suffered more than $14 million in losses in the fourth quarter of 2006 for a 39 cents per share loss; (iv) it expected to have no REIT taxable income for the next fours years and, consequently, there would be no requirement to pay dividends to shareholders over the next four years; and (v) the Company's management was considering whether or not to retain the Company's REIT status.

30.     In response, the market responded swiftly, with NovaStar's stock price dropping more than 30% on extremely high trading volume.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased NovaStar common stock or call options during the Class Period or sold NovaStar put options during the Class Period (the "Class").   Excluded from the Class are Defendants, officers and directors of the

22

Company, members of the immediately families of the officers and directors of the Company, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable.   The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. NovaStar had more than 24 million shares of stock outstanding, owned by hundreds if not thousands of persons.

33.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

>            (a)     Whether the federal securities laws were violated by Defendants;
>
>            (b)     Whether Defendants omitted and/or misrepresented material facts;
>
>            (c)     Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
>
>            (d)     Whether Defendants knew or recklessly or deliberately disregarded that their statements were false and misleading;
>
>            (e)     Whether Defendants participated and pursued the common course of conduct complained of herein;
>
>            (f)     Whether the market price of NovaStar Financial, Inc. securities was inflated artificially or distorted as a result of Defendants' material misrepresentations and/or omissions during the Class Period; and
>
>            (g)     The extent of damage sustained by Class members and the appropriate measure of damages.

Case 4:07-cv-00282-ODS   Document 1   Filed 04/10/07   Page 23 of 29

34. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

35. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

36. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### NOVASTAR'S REPORTED FINANCIAL RESULTS DURING THE CLASS PERIOD WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC REPORTING RULES

37. The financial results reported by NovaStar during the class period falsely inflated the Company's revenue and net income. These results were: (i) included in Forms 10-Qs filed with the SEC; (ii) included in press releases disseminated to the public.

38. Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R.

(b) The principle that financial reporting should provide information that is useful to §210.10-01(a).

39. NovaStar's financial statements were materially misstated because the Company failed to properly accrue and report loan loss reserves.

40. As a result of these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, 10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, 34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, 40);

(d) The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1, 42);

(e) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to shareholders for the use of enterprise resources entrusted to it (FASB Statement of

25

Concepts No. 1, 50);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, 58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, 79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

41.     Moreover, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**COUNT I**
**FOR VIOLATION OF §10(b) AND RULE 10b-5**
**OF THE 1934 ACT - AGAINST ALL DEFENDANTS**

42.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

43.     During the Class Period, defendants disseminated or approved the false

26

statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44.     Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

      (a)     Employed devices, schemes, and artifices to defraud;

      (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their transactions in NovaStar Securities during the Class Period.

45.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they transacted in NovaStar Securities at artificially inflated or distorted prices. Plaintiff and the Class would not have transacted in NovaStar Securities at the price they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated or distorted by defendants' misleading statements.

46.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their transactions in NovaStar Securities during the Class Period.

27

## COUNT II

### FOR VIOLATION OF §20(a) OF THE
### 1934 ACT - AGAINST ALL DEFENDANTS

47.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

48.     The Individual Defendants acted as controlling persons of NovaStar within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of NovaStar, and their ownership of NovaStar stock, the Individual Defendants had the power and authority to cause NovaStar to engage in the wrongful conduct complained of herein. NovaStar controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and NovaStar are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to FRCP 23;

B.      Awarding Plaintiff and the members of the Class damages, together with interest thereon.

C.      Awarding Plaintiff reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**SPEER LAW FIRM, P.A.**

By: /s/ Charles F. Speer
Charles F. Speer    MO  40713
Donnamarie Landsberg MO 40210
Tammy R. Dodson MO 48223
104 W. 9th Street, Suite 305
Kansas City, MO 64105
Phone:  (816) 472-3560
Fax: (816) 421-2150
cspeer@speerlawfirm.com
dlandsberg@speerlawfirm.com
tdodson@speerlawfirm.com

David A.P. Brower
**Brower Piven**
488 Madison Avenue
Eighth Floor
New York, NY 10022
Phone: (212) 501-9000
Fax: (212) 501-0300
brower@browerpiven.com

29